Alright, looks like council is ready. Let's call 18-2118 United States v. Antonio. Ms. Rivas, you may proceed. Good morning, Your Honor. I'd like to reserve five minutes for rebuttal. Your Honor, the federal courts are courts of limited jurisdiction. Mr. Antonio was wrongly convicted with insufficient evidence in violation of his due process rights. Your Honor, the court has seen the district court's memorandum in opinion regarding how it decided this issue and based its decision on New Mexico Pueblo lands act amendment of 2005. However, nowhere in the trial court did the government in their brief or in their presentation or in their argument at trial did they argue anything about the Indian Pueblo land act amendment. The court... Are you saying the district court does not have the authority to predicate his or her decision on a law that wasn't argued? Your Honor, what we're saying is that this law, this amendment from 2005, as we stated in our brief, does not... It actually excludes this piece of property from federal jurisdiction. So it's not that the district court was wrong procedurally to predicate its decision on this Pueblo land act of 2005, but you think in fact that law does not apply to what happened here? Correct, Your Honor. We brought this appeal on both issues. One, that Mr. Antonio's right to have every element of the charge proved against him was not met by the government. And two, that the 2005 Pueblo lands act amendment would not provide the court with jurisdiction. What's the fatal flaw in the district court's jurisdictional decision? Your Honor, the two issues that we brought, which the court failed to analyze, are one, that the Pueblo lands act indicates that so long as those boundaries were confirmed by Congress, and also that the court failed to analyze except as otherwise provided by Congress. It's our position, Your Honor, that this land and this exterior boundary was not confirmed by Congress. Let me break it down a little bit. I love this case because how often you go back to the Spanish acquisition. So 1748, the land is transferred from Spain to the Sandia Pueblo Indians. Yes, Your Honor. Right. And then my favorite treaty, the Treaty of Guadalupe Hidalgo. It's amazing how many cases that revolve around that. That's 1848, and the property is then acquired by the United States at that time. Your Honor, it's our position that when Congress confirmed that, the confirmation of 1858 specifically excluded lands that were privately owned. Okay. Why doesn't the 1858 confirmation decide this case? This 1858 confirmation. I mean, Congress confirmed the boundaries to the Rio Grande River, which would be west of where the accident took place in this case. And everybody concedes the other three boundaries are within the Pueblo. Why doesn't the 1858 congressional confirmation answer the legal question here? Your Honor, the 1858 confirmation fails to confirm the boundary as it relates to this particular tract of land. Let me understand one thing. In 1858, what is transferred? Private property was still respected, right? Correct. So when the boundary was set, as I understand your argument, you're saying it couldn't have included this private land. Correct. It had to include some other land, right? I mean, what other land? It included, in our particular situation, Your Honor, it included the land above this private piece of property and the land below this private piece of property, but not confirmation as it relates to this particular tract of land regarding this boundary. Well, there could be other pieces of private property within the boundaries of the reservation. I mean, that happens with a lot of frequently. Why couldn't Congress define the exterior boundaries, recognizing that there's going to be some private holdings within that? Your Honor, it's our position that the 1858 confirmation by Congress specifically included the private lands. As it relates to this particular land, we asked the court to find that for Mr. Pedro Garcia to obtain the patent that he obtained in 1933, this particular tract of land had to have not been included in the 1858 confirmation. And why is that? That was one part of your argument that I didn't follow completely. Why do you know the Garcia parcels predate at 1858? Your Honor, because the Pueblo Lands Act of 1924 could not have given to Mr. Garcia a land that he did not. Why couldn't he have acquired the property after 1858? Because it's our position that the Pueblo Lands Act would not have recognized that right. Okay. Kind of walk me through how you get there. Why does the logic follow that the Garcia parcels had to predate 1858? Your Honor, it had to predate 1858 as per our analysis of United States v. Vermont. And now it analyzes this situation and provides three classes of people who could obtain title as a result of the 1924 Act. And again, the government failed to prove whether it was the government's burden to prove jurisdiction. But it is possible that Pedro Garcia's land was one held adversely in the Pueblos before the 1858 grant, which was one of the classes that would allow that recognition of his right. What do we do with the evidence in the record that the river has shifted some and the Sandias have claimed the recovered land between the Garcia track and the river? So, you know, at least on paper now, maybe not legally, it looks like the property in question has been encircled.  Your Honor, there's two answers to that question. One is that the district court did not base their decision on that issue. The district court analyzed that in the court's words, I believe, or as a courtesy to the parties. And two, it's inconsistent. Do you think it's legally significant? It's inconsistent, Your Honor, that a western boundary of one property would move if described as the Rio Grande and another piece of property would not move if the boundary was described as the Rio. It's illogical or inconsistent that one boundary would move and not the other. But if you read the statute literally, I guess the ownership status of that reclaimed land might be legally significant. Your Honor, again, the district court did not base its decision on that, and that was something that does not really go to the 2005 Pueblo Lands Act analysis. And so, and again, this information was not a basis of the court's decision. It should have been analyzed, and Mr. Antonio's rights were. It's typical throughout history to define property boundaries by some type of natural barrier. Here was a river. It could be the ocean or a large lake. Or an oak tree. An oak tree or a cornwall bench, I suppose. But if you have a situation like this where you have kind of an immovable natural barrier, say a mountain range or something, everybody knows where the boundaries are, why would it matter that there would be a spinoff of property, so private enclaves created between the reservation land and the natural barrier? Why should that matter? Your Honor, our position is that this is important because Mr. Garcia's land went to the river. And so, again, we are disputing whether this boundary was confirmed by Congress, Your Honor. And my time is up. Okay. Wait a minute. What do you mean your time is up? Reserving some time? Yes, Your Honor. I asked for that. I had a question on your fourth issue. Yes, Your Honor. If I could. I mean, that seemed to me to not just be a throwaway issue. I was ‑‑ what you're saying is that your theory of the case could never have been reached because of the manner in which the jury was instructed. Correct, Your Honor. Do I understand that argument correctly? Correct, Your Honor. And your argument is that the way the jury was instructed, they said, if you do not find in favor of the government on its theory, then you can consider the defense theory. Correct, Your Honor. And that because of that, the defense theory of the case was never independently analyzed and the state of mind was not independently analyzed. Correct. Because of that, you were deprived a fair trial. Correct, Your Honor. And what's your best case in support of that proposition? Your Honor, I apologize. I don't have a case to cite. Okay. I would refer the court to our brief. All right. Thank you. All right. Let's hear from the government then. Good morning, Your Honors. And if it pleases the court, John Anderson on behalf of the United States. In passing the 2005 amendments to the Pueblo Lands Act, Congress put to rest any lingering uncertainty and conclusively established the reach of federal criminal jurisdiction throughout the exterior boundaries of Pueblo of New Mexico, notwithstanding the existence of fee lands within those exterior boundaries. Do we need to know when the Garcia parcel was acquired? No, Your Honor. In other words, before or after 1858? No, Your Honor. And I would submit that it is that type of inquiry that the 2005 amendments to the Pueblo's Land Act was intended to obviate. It was intended to simplify the statutory structure and make the presence of federal criminal jurisdiction clear without exactly that type of inquiry. And Congress decided to do that by returning the test to the original, the grant from the prior sovereign, as the court referenced earlier. In 1857 or 1840, before the Mexican-American War, the Treaty of Guadalupe Hidalgo, what was the status of the boundaries of the Pueblo under the prevailing authority at that time? Well, Your Honor, at that point, you know, Because you have the Spanish, you have the Mexican Revolution within Mexico itself, and so there's all kinds of shifting back and forth of governments. But insofar as the Pueblo itself was concerned prior to the treaty, what was the status of the boundaries? Well, the status of the land at that point, Your Honor, would have been, the title would have been held by the Pueblo of Sandia, pursuant to the earlier grant from the Spanish authority in, I believe it was 1748. Is that true with respect to the discrete property at issue here? I thought that had come down under a separate grant. Your Honor, my understanding is that the entirety of the grant, in other words, to include the fee land on which this accident occurred, I think there's no dispute that it's within the original boundaries of the grant. Page 31 of the appellant's brief says there's no dispute that it falls within those original exterior boundaries under the grant from the Spanish authority. All right. That answers the court's question. It does answer my question. And there was nothing in the treaty according to you that would have changed those boundaries? That is correct, Your Honor. And when we look at the Surveyor General's report, in fact what we see is that the Surveyor General from New Mexico, who was charged with conducting that survey as to Sandia Pueblo, in fact did not conduct the survey but relied upon – Sandia was one of the few pueblos that retained the original documentation from the Spanish grant. And so the Surveyor actually didn't go out and do that survey, but instead relied on the documentation that was issued in connection with the 1748 grant from the Spanish authority. Does that go to the original course of the river? Your Honor, the original course of the river, it's an interesting issue, but I submit that in this case it's an irrelevant one. Again, there's no dispute that the accident here occurred within those exterior boundaries. I understand. What if the accident or a crime had been committed in that kind of no man's land? I called it the reclaimed property. Who has jurisdiction over that? In other words, the court is positing that there's a strip of land that emerges on the western boundary of the Pueblo. It's an interesting issue, Your Honor. Is it federal jurisdiction? I believe that it would be, Your Honor, and my reasoning would be, and some looked at this and it was a new area for me, but at the common law I believe the accretion, in other words, land that builds up as a result of the slow movement of a body of water over time belongs to the upland owner. That's different if there is an earthquake that changes in a very fast way, but the accretion, at least at the common law, does vest in the upland owner. The title would accrete to the fee holders of the land at issue, and the question of jurisdiction would not necessarily come up, would it? That's true, Your Honor. I mean, the question of jurisdiction, I think, again, I would go back to the 2005 Act when it looks at the original boundaries, but that's correct. What does the Act say that is dispositive to this issue? What's the language in the Act? Is the Court referencing the 2005? The 2005, yes. Your Honor, the dispositive language I see is anywhere within the exterior boundaries of any grant from a prior sovereign as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico. How do you get the as confirmed by Congress leg approved? Your Honor, the 1858 statute confirms the boundaries as provided by the survey. And again, that in this case is the original boundaries described in the 1748 grant from the Spanish Authority. And if I may, let me touch on what I think is the point of contention in this case, which is the effect and the construction of the proviso at the conclusion of the 1858 statute. That proviso provides that the confirmation will not affect any private interest or private claims that may obtain within the exterior boundaries. And I understand Mr. Antonio's position here to be that the proviso should be read to exclude from the confirmation any tracts of land over which there is a private claim, in other words, a claim by a party other than the Pueblo. And on that note, I would point the Court to the Supreme Court's 1899 decision in Conway, which is cited in Mr. Antonio's reply brief. And that does provide some important color to the case because it describes the fact that the confirmation by Congress was effectively in the nature of a quit claim. And Conway talks about the fact that the confirmation does not prohibit any competing private parties from bringing its own claim on page 71 of the Conway decision. How can a confirmation be a quit claim, or how can a quit claim be a confirmation? Your Honor, essentially what... A quit claim is saying we're not warranting anything. That's correct, Your Honor. And what the confirmation was saying was, and I can use the words, and I can say it better than Conway, a confirmation, the Court in Conway says, quote, a confirmation is made if the claimant appears to have, as between himself and the United States, the right to it, but subject to the rights of others who are at liberty to assert their superior title in the local courts. So the Court in Conway was being very clear that the fact of confirmation does not prohibit a private party from coming into what at that time would have been a New Mexico territorial court and asserting that as between those two private parties, A or B has a superior title. And the Court in Conway does note the fact that the confirmation or the patent issued pursuant to a confirmation is, quote, in the nature of a quit claim, an admission that rightful ownership had never been in the United States but had passed at the time of the session to the claimant or to those under whom he claimed. So my ultimate point there, Your Honor, and I may be a little long-winded in answering your question, and I apologize, but the point is that the proviso does not accept from the fact of confirmation lands over which there may be a private claim, and Conway makes clear... The proviso does not accept. Not accept. Accept. It does not exclude. A or E. It does not E. Accept. Correct, Your Honor. So in your theory, the fact that there's a peninsula here that reaches into the Pueblo is irrelevant because what matters is what the boundaries were in 1748 as confirmed in 1858. That's correct, Your Honor, and again, I would come back to the point that I believe was Congress's intention in doing that was to simplify that analogy and not require district courts to go back and investigate those types of issues but to simplify the issue and to make... Well, on that point, and it seems to me that to some degree all of this discussion begs the issue in the sense that in my reading of the briefs, the argument here is that the government has the burden of proof as an element of proof in the crime charged to prove jurisdiction and that the matter was never put to the jury to decide and more importantly, was not decided. That it was not decided except for the district court saying, well, I'm going to decide this and I'm going to issue an opinion and then halfway through the trial says, I'm going to issue an opinion on this. I'm maintaining an open mind. I'm going to... Give me a break. At some point, you've got to decide this. You know, you've got to prove your case. And the government, when the government arrested its case, the court still hadn't decided. The court never issued... When did the court issue a written decision on this point? The court's memorandum of opinion and order came out after the jury had returned the verdict. Right. Right. After the case had closed. After the jury... Oh, yeah. Oh, I think we forgot an element of proof. Yeah, I think I better get around to writing that order. That is not a proper way to prove a criminal case, is it? Well, I respectfully would differ with the court's characterization of what happened here. There was... I'm just... Hey, I'm just a poor old simple judge who reads the briefs. I'm just characterizing what the briefs said. Oh, absolutely, Your Honor, and I think... Don't blame me. Blame the briefs. Absolutely, Your Honor. That's a fair point. And I would suggest that what the court did here, where the court made its ruling, was in its decision to include the instruction, in its instructions to the jury, include the finding that the situs of land... Had the government closed the case at that point? Well, at the point the government... Had the government closed its case at that point? It had, Your Honor, but I would... Thank you. I would note that the counsel, the prosecutor, the AUSA involved in the case had requested at that point that the jury be instructed prior to the close of the case, and defense counsel said, you don't have to do that, Judge, we're not going to make a Rule 29 on that basis, and the district court did not do that. So it's an invited error? I would suggest that to the extent that is the argument, to the extent this court is concerned that it was not done at the close of the government's case, I would submit that, yes, it is. But the finding was made in the jury instructions, and I would also note that defense counsel at the trial level acknowledges that the ruling was made. On page, I believe it's 738 of the record, the court says, they're arguing, I believe it's the Rule 29, and the defense counsel says, Judge, you've made a ruling on the jurisdictional issue, we disagree with it, but you've made your ruling and we'll take it up down the road, which presumably means here we are down the road. But there was an acknowledgment by defense counsel that the district court had issued a ruling on the jurisdictional issue. Could you touch on Judge Lucero's question to other counsel about the jury instruction sequencing? Certainly, Your Honor. As I understand the argument, as I understand Judge Lucero's question, is the jury not invited to fully consider the alternative theory of the lesser-included offense? Right. And I would submit on that point that there are a number of elements of the record here that give the court some comfort on that issue. Well, we have a case, I think, on point, don't we, that it's okay to do it that way? Well, there is the Viss-Naiz case, and I may be butchering that name, but the Viss-Naiz case expressly says that that step-down instruction is permissible. In other words, it is entirely permissible for a district court to say, only if you unanimously find the defendant not guilty on the higher charge may you proceed to consider the lesser-included. But I think there may be a little – right, to have the defense theory of the case considered independently and separately. I think that's correct, Your Honor. I think that is a little different gloss in what the argument is. And at that point, again, I think the record should give this court some comfort insofar as the instruction as to the mental state necessary for the lesser offense was read to the jury. The jury was instructed to read the instructions in their entirety upon returning to the jury room. And if you read the closing argument that the defense made, it hit that point very hard with the jury. So there were a number of occasions in which the jury was reminded, both by the judge, by defense counsel, and by the jury instructions themselves, about the mental state that was necessary or was suggested by that lesser-included. So to the extent the argument is that the jury would never have reached that or read that instruction or considered that mental state, I would suggest and submit that the record belies that contention. I see I'm running low on time, Your Honors. And if there are no further questions, I would cede what little time I have left. Thank you, counsel. Ms. Rievich, you have some rebuttal time if you want. Your Honors, regarding the jury instruction, the instruction, we assume that juries follow instructions. And so the specific instruction to not consider involuntary manslaughter without first considering secondary murder, one presumes that the jury, because they found Mr. Antonio guilty of the first charge, never considered the second. In our particular case, that's particularly egregious because the mens rea is so similar. In one, the mens rea is, I believe, wanton and reckless disregard. Well, how do you get around it? I have the same problem that your colleague had. Was it Viznaez or however you pronounce that case? How do you get around that case? Your Honor, I apologize. I cannot answer that question. Well, give it a shot. I mean, you owe a duty to your client to give it your best effort. It just seems to me that the best argument would be my question. That is, they didn't seem to consider this issue in Viznaez. Was it before the court? Or maybe it was. I don't know. That's why I asked the question. Your Honor, again, I apologize. There was no objection below. We're on plain air review, aren't we? Yes, Your Honor. Yes, Your Honor. And, Your Honor, we'd ask that the court find that the government failed to prove an element of the crime. We do not concede jurisdiction. But this very complicated analysis was not completed at the trial court level. And I would cede my time, Your Honor. Thank you, counsel. I think we understand your arguments. Both of you are excused and the case will be submitted.